

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-29-2008

# Great Amer Ins Co v. Norwin Sch Dist

Precedential or Non-Precedential: Precedential

Docket No. 07-2441

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Great Amer Ins Co v. Norwin Sch Dist" (2008). *2008 Decisions.* Paper 430.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/430

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 07-2441

GREAT AMERICAN INSURANCE CO.

v.

NORWIN SCHOOL DISTRICT

v.

SHOFF CONSTRUCTION AND DESIGN, INC.
FOREMAN PROGRAM & CONSTRUCTION MANAGERS,
INC.


Foreman Program & Construction Managers, Inc.,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 04-cv-01148
District Judge: The Honorable Terrence F. McVerry

_____

ARGUED May 20, 2008

Before: SMITH and NYGAARD, *Circuit Judges*,

and STAFFORD, *District Judge*[*]

(Filed: September 29, 2008)

Amy E. Bentz, Esq. (Argued)
James W. Bentz, Esq.
Bentz Law Firm
680 Washington Road
The Washington Center Building
Pittsburgh, PA 15228-0000
        *Counsel for Great American Insurance Company*

David Raves, Esq.
Maiello, Brungo & Maiello
3301 McCrady Road
One Churchill Park
Pittsburgh, PA  15235-0000
        *Counsel for Norwin School District*

Ross A. Giorgianni, Esq. (Argued)
Metz Lewis
11 Stanwix Street
18th Floor
Pittsburgh, PA 15222-0000
        *Counsel for Shoff Construction and Design, Inc.*

---

[*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

Mark J. Gesk, Esq. (Argued)
Wayman, Irvin and McAuley
1624 Frick Building
437 Grant Street
Pittsburgh, PA 15219-0000
     *Counsel for Foreman Program & Construction Managers, Inc.*

---

OPINION

---

STAFFORD, *District Judge*.

Third-Party Defendant, Foreman Program & Construction Managers, Inc. ("Foreman"), appeals from a judgment entered in favor of Third-Party Plaintiff, Norwin School District ("Norwin"), on Norwin's breach of contract claim against Foreman. We vacate the District Court's judgment and remand to the District Court with directions to enter judgment in Foreman's favor.

## I. FACTS

Our trek through the factual morass from which this case arose begins in 2001, when Norwin undertook two public school construction projects. These two projects spawned, *inter alia*, four contracts and two payment bonds, namely: (1) two

3

construction contracts, under which Shoff Construction and Design, Inc. ("Shoff"), agreed to serve as the general contractor for the two projects, one for the construction of a new Sheridan Terrace Elementary School and one for renovations and additions to Hillcrest Intermediate School, both in North Huntingdon, Pennsylvania; (2) an architectural services contract, under which N.J. Cunzolo & Associates, Inc. ("Cunzolo"), agreed to serve as architect for the two projects; (3) a construction management services contract, under which Foreman agreed to perform construction management services for the two projects; and (4) two payment bonds,[1] one on each project, issued by Great American Insurance Company ("GAIC") as surety on behalf of Shoff as principal and in favor of Norwin as obligee.

A. *The Norwin-Foreman Construction Management Contract*

Norwin and Foreman entered into a construction management contract (the "CM Contract") on August 20, 2001, using the American Institute of Architects ("AIA") standard form B801/Cma–1992, entitled "Standard Form of Agreement Between Owner and Construction Manager." As noted on the cover page of the agreement, Form B801/Cma–1992 was intended to be used in conjunction with the 1992 edition of AIA standard form B141/Cma, entitled "Standard Form of

---

[1] Shoff also procured two performance bonds from GAIC, neither of which is at issue in this case.

Agreement Between Owner and Architect." Both forms incorporated by reference standard form A201/Cma–1992, entitled "General Conditions of the Contract for Construction" ("General Conditions"). The lump sum fee to be paid Foreman for its services under the CM Contract was $807,168.00 ($391,408.00 for Sheridan and $415,760.00 for Hillcrest).

The CM Contract required Foreman to act as a joint adviser (with Cunzolo, the architect) to Norwin throughout the Sheridan and Hillcrest projects. During the pre-construction phase of the projects, Foreman was required to assist Norwin in a number of tasks, including selection of the project contractors and preparation of the construction contracts. Once the construction contracts were awarded, Foreman was responsible for administering those contracts in cooperation with Cunzolo as set forth in Form A201/Cma.

Among other things, Foreman was required to review Shoff's applications for progress and final payments. Based on Foreman's observations of the work performed and evaluations of Shoff's applications for payment, Foreman was required to certify the amounts to be paid to Shoff by Norwin. As stated in Article 2.3.11.3 of the CM Contract, Foreman's certification constituted "a representation to [Norwin] . . . that the Work ha[d] progressed to the point indicated and the quality of the Work [wa]s in accordance with the Contract Documents." Under Article 2.3.11.4, the issuance of a certificate of payment was <u>not</u> a representation that Foreman had "(1) reviewed

construction means, methods, techniques, sequences for [Shoff]'s own Work, or procedures, (2) reviewed copies of requisitions received from Subcontractor and material suppliers and other data requested by [Norwin] to substantiate [Shoff]'s right to payment, or (3) ascertained how or for what purpose [Shoff] ha[d] used money previously paid on account of the Contract Sum."  Indeed, Article 4.7 provided that Norwin, not Foreman, was responsible for furnishing any services necessary "to ascertain how or for what purposes [Shoff] ha[d] used the money paid by or on behalf of [Norwin]."  In other words, before issuing a certificate for payment, Foreman was required to verify the quality and quantity of Shoff's work but not the appropriateness of Shoff's expenditure of monies.

B.  *The Norwin-Cunzolo Architectural Services Contract*

Cunzolo and Norwin entered into an architectural services contract (the "AS Contract") using Form B141/Cma, the Form intended to be used in conjunction with Foreman's CM Contract.  Like the CM Contract, the AS Contract incorporated by reference the General Conditions set forth in form A201/Cma.

In addition to design services, Cunzolo agreed to perform construction administration tasks in cooperation with Foreman. Among other things, Cunzolo—like Foreman—was required under the terms of the AS Contract to review and certify the amounts due to Shoff.  In particular, at the time of final

6

completion of the projects, Cunzolo was required—under Article 2.6.14 of the AS Contract—to issue "a final Project Certificate for Payment upon compliance with the requirements of the Contract Documents." As stated in Article 2.6.9.1, Cunzolo's certification constituted "a representation to [Norwin] . . . that . . . the work ha[d] progressed to the point indicated and the quality of the Work [wa]s in accordance with the Contract Documents." Under Article 2.6.9.2, Cunzolo's certification was not a representation that Cunzolo (1) "made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers, or (4) ascertained how or for what purpose [Shoff] ha[d] used money previously paid on account of the Contract Sum." Like Article 4.7 in the CM Contract, Article 4.9 in the AS Contract made it Norwin's responsibility to provide all necessary services—including auditing services—"to verify [Shoff's] Application for Payment or to ascertain how or for what purposes [Shoff] ha[d] used the money paid by or on behalf of [Norwin]." As was the case for Foreman, Cunzolo was required to verify the quality and quantity of Shoff's work before issuing a certificate of payment, but he was not required to verify the appropriateness of Shoff's expenditure of monies.

C. *The Norwin-Shoff Construction Contracts*

Norwin and Shoff entered into the Sheridan and Hillcrest

7

construction contracts (collectively the "Shoff Contracts") on February 18, 2002, and April 17, 2002, respectively, using the AIA standard form A101/CMa, entitled "Standard Form of Agreement Between Owner and Contractor." The Shoff Contracts specifically incorporated not only form A201/CMa, containing the General Conditions applicable to construction contracts, but also document 00800, entitled "Supplementary Conditions."[2] The contract price of the Sheridan project was $3,750,700.00; the contract price of the Hillcrest project was $5,422,400.00.[3]

Each of the Shoff Contracts required Norwin to make monthly progress payments to Shoff based upon "Applications for Payment" submitted by Shoff to Foreman and upon "Certificates for Payment" issued to Norwin by Foreman and Cunzolo. The amounts requested in each Application for Payment were required to be based upon a "Schedule of Values" that allocated the entire contract sum among the various portions of the work to be done. Upon receipt of an Application for Payment, Foreman was required to forward the application to Cunzolo. If Foreman and Cunzolo were both satisfied with the

[2] The General Conditions were effective only to the extent that they were not modified, voided, or deleted by the Supplementary Conditions.

[3] With change orders, the final contract price for the Sheridan project was $3,731,574.00. For the Hillcrest project, the final contract price was $5,615,267.11.

amounts requested in the Application for Payment, they issued a Certificate for Payment—signed by each—to Norwin.

Consistent with provisions in both the CM Contract and the AS Contract, the Shoff Contracts—through Article 9.4.3 of the General Conditions—provided that the issuance of a Certificate for Payment constituted "representations made separately by [Foreman] and [Cunzolo] to [Norwin], based on their individual observations at the site and the data comprising the Application for Payment submitted by [Shoff], that the Work ha[d] progressed to the point indicated and that, to the best of [Foreman]'s and [Cunzolo]'s knowledge, information and belief, quality of the Work [wa]s in accordance with the Contract Documents."  Also consistent with the CM Contract and the AS Contract, Article 9.4.3 of the General Conditions provided that a Certificate for Payment did not constitute a representation that Foreman or Cunzolo

> "(1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed [Shoff's] construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by [Norwin] to substantiate [Shoff]'s right to payment, or (4) made examination to ascertain how or for what purpose [Shoff] ha[d] used money previously paid on

9

account of the Contract Sum."

Until the work was fifty percent (50%) complete, Norwin was required under Article 5.6.1 of the Shoff Contracts to retain ten percent (10%) from its monthly payments as security against Shoff's performance. Article 5.7.1 in each of the Shoff Contracts provided that, upon "Substantial Completion" of the work, progress payments were to be modified by adding "a sum sufficient to increase the total payments to ninety-five percent (95%) of the Contract Sum, less such amounts as [Foreman] recommends and [Cunzolo] determines for incomplete Work and unsettled claims." The Sheridan contract, but not the Hillcrest contract, defined "Substantial Completion" to mean fifty percent (50%) completion. The Sheridan contract, but not the Hillcrest contract, further specified that retainage was to be reduced to five percent (5%) when the work was fifty percent (50%) complete.[4]

Using somewhat different language, the Supplementary Conditions applicable to both contracts addressed the matter of retainage as follows:

---

[4] Article 5.8 in each of the contracts provided that "[r]eduction or limitation of retainage, if any, shall be as follows . . .." In the Sheridan contract, the words "[r]educe to 5% at 50% of work installed" had been added after the word "follows." In the Hillcrest contract, no reduction or limitation of retainage was specified.

9.3.6: The sum or sums withheld by [Norwin] from [Shoff] shall be 10 percent of the amount due [Shoff] until 50 percent of the Contract is completed. When the Contract is 50 percent complete, one-half of the amount retained by [Norwin] shall be released to [Shoff], provided that [Cunzolo] approves the Application for Payment; and provided further, that [Shoff] is making satisfactory progress and there is no specific cause for greater withholding.

9.3.7: The sum or sums withheld by [Norwin] from [Shoff] after the Contract is 50 percent completed shall not exceed 5 percent of the value of completed work based on monthly progress payment requests.

Article 6 in the Shoff contracts provided that "[f]inal payment, constituting the entire unpaid balance of the Contract Sum, shall be made by [Norwin] to [Shoff] when (1) the Contract has been fully performed by [Shoff] . . . and (2) a final Project Certificate for Payment has been issued by [Foreman] and [Cunzolo]." The parties' responsibilities with regard to final payment were explained in greater detail in the General Conditions:

9.10.1. Upon completion of the Work, [Shoff] shall forward to [Foreman] a written notice that the Work is ready for final inspection and acceptance and shall also forward to [Foreman] a final Contractor's Application for Payment. Upon

11

receipt, [Foreman] will forward the notice and Application to [Cunzolo] who will promptly make such inspection. When [Cunzolo], based on the recommendation of [Foreman], finds the Work acceptable under the Contract Documents and the Contract fully performed, [Foreman] and [Cunzolo] will promptly issue a final Certificate for Payment stating that to the best of their knowledge, information and belief, and on the basis of their observations and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due [Shoff] and noted in said final Certificate is due and payable.

The General Conditions further provided that the final Certificate for Payment constituted a "representation that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled." Subparagraph 9.10.2 of the General Conditions provided that "[n]either final payment nor any remaining retained percentages shall become due" until Shoff submitted to Cunzolo through Foreman certain documents, including, *inter alia*, (1) "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which [Norwin] or [Norwin]'s property might be responsible or encumbered . . . ha[d] been paid or other wise satisfied;" and (2) "consent of surety, if any, to final payment."

C. *The Payment Bonds*

12

As required under Pennsylvania law and Article 11.4.1 of the Supplementary Conditions, Shoff was required to procure payment bonds for the two school projects, each in the amount of one hundred percent (100%) of the contract price. Shoff obtained the required payment bonds from GAIC.[5] Under paragraph 1 in each of the payment bonds, GAIC and Shoff agreed to jointly and severally bind themselves to Norwin "to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference." Paragraph 8 in each of the two bonds states: "By [Shoff] furnishing and [Norwin] accepting this Bond, they agree that all funds earned by [Shoff] in the performance of the Construction Contract are dedicated to satisfy obligations of [Shoff] and [GAIC] under this Bond, subject to [Norwin]'s priority to use the funds for the completion of the work."

To obtain the bonds, Charles and Melanie Shoff signed an "Agreement of Indemnity"—dated July 26, 2001—under which they agreed to indemnify GAIC for any losses and expenses arising from issuance of the bonds. In addition, on March 25, 2004, the Shoffs executed a loan and collateral security agreement, which provided, *inter alia*, that "as of the date of this agreement, there were in excess of $750,000.00 in accrued debts owed to the equipment, labor and materials suppliers relating to the [bonded] Projects," and "[the Shoffs] have requested financial assistance from [GAIC] to enable

---

[5] The record contains copies of the two payment bonds. The bond on the Hillcrest project is signed; the bond on the Sheridan project is not.

13

[Shoff] to meet its financial obligations and complete its bonded construction projects that have not been terminated." GAIC obtained a mortgage on the Shoff's personal property as collateral security on the loan note.

## D. *The Payments*

Shoff received eighteen (18) progress payments on the Sheridan project and seventeen (17) progress payments on the Hillcrest project. For each payment, Shoff submitted Applications for Payment, designating both the contract sum earned to date and the amount of retainage—expressed both as a percentage and a dollar amount—to be subtracted from the total earned. In each case, Shoff obtained a Certificate of Payment from Foreman and Cunzolo and received payment from Norwin with the designated retainage subtracted. At the time of each payment, Shoff, Foreman, Cunzolo, and Norwin were all aware of the amounts—in terms of dollars and percentages—being retained from the payments due.

On the Sheridan project, Shoff designated ten percent (10%) retainage on the first six of its Applications for Payment. On the next nine Applications for Payment, when the work was fifty percent (50%) or more completed, Shoff designated five percent (5%) retainage. On Application No. 16, when work completed to date totaled $3,652,547.49 (ending contract price was $3,731,574.00), Shoff designated retainage of two and a half percent (2.5%). On Application Nos. 17 and 18, Shoff reduced retainage to less than one percent (0.67%).

On the Hillcrest project, Shoff designated ten percent

(10%) retainage on the first five of its Applications for Payment. On the next seven Applications for Payment, when the work was fifty percent (50%) or more complete, retainage was at or near five percent (4.75% to 5%). On Application No. 16, when work completed to date was estimated at a total of $5,649,902.51 (ending contract price was, in fact, $5,615,267.11), Shoff designated retainage of three and a half percent (3.5%). On Application No. 17, retainage was reduced to two percent (2%).

Each time Shoff submitted an Application for Payment, Charles Shoff, as President of Shoff, certified as follows:

> [T]o the best of the Contractor's knowledge, information and belief the work covered by this application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by Contractor for Work for which previous Certificates for Payment were issued and payments received from the owner, and that current payment shown herein is now due.

Shoff's certifications were sworn and notarized. As provided in Article 9.4.3 of the General Conditions, Foreman had no duty to "ma[k]e examination to ascertain how or for what purpose [Shoff] ha[d] used money previously paid on account of the Contract Sum."

Shoff submitted its final Applications for Payment for Sheridan on September 4, 2003, and for Hillcrest on November

15

24, 2003. Shoff requested a final payment of $24,961.17 for Sheridan and $78,362.65 for Hillcrest. On the Sheridan project, Foreman and Cunzolo both signed the final Certificate of Payment in the amount of $19,961.17, $5000.00 less than was requested. On the Hillcrest project, Foreman, but not Cunzolo, signed the final Certificate of Payment in the amount of $78,362.65.

With its final Applications for Payment, Shoff transmitted affidavits—one each for the two projects—to Foreman, indicating that all of Shoff's debts relating to the two projects had been paid. Specifically, on AIA form G706, "Contractor's Affidavit of Payment of Debts and Claims," Shoff certified that "payment has been made in full and all obligations have otherwise been satisfied for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness." On the Affidavit forms were boxes for Shoff to check, indicating whether the "Consent of Surety to Final Payment" was or was not attached.[6] Shoff checked neither box, and the Consent of Surety to Final Payment was not attached.

Foreman admitted that it did not obtain the consent of surety before certifying Shoff's final Application for Payment on both projects. Foreman explained that it signed and submitted the Final Certificates for Payment without the consent of surety because (1) it had not experienced any problems with Shoff on

_____

[6] The G706 form provided that "[w]henever Surety is involved, Consent of Surety is required."

past projects, (2) Shoff's performance on the Sheridan and Hillcrest projects—both in terms of timeliness and quality—had been very good, (3) Shoff had met its obligations with regard to final punch list items, (4) contractors and subcontractors generally want to be paid promptly, (5) Norwin's board met only once in a 30-day period to approve and issue payments, (6) Foreman wanted to get the Final Certificates for Payment "in the works" so that those certificates could be submitted at the next school board meeting, and (7) Shoff had indicated that the surety's consent would be forthcoming.

Unknown to Foreman, and despite certifications and affidavits to the contrary, Shoff failed to pay all of its debts to subcontractors and suppliers, resulting in liens that were not disclosed to Foreman, Cunzolo, or Norwin. Shoff's President, Charles Shoff ("Charles Shoff"), explained at trial that, while the payments his company received from Norwin were used to pay subcontractors and vendors, the jobs "lost $800,000," meaning "there wasn't enough money to pay" all of the debts. Indeed, it appears that some of the subcontractors and suppliers had begun making claims against the payment bonds before Shoff made its final Applications for Payment, a fact that was communicated to neither Foreman nor Norwin.[7] It was not until

---

[7] GAIC's representative, Joel Beach ("Beach"), testified at trial that, had consent of surety been requested at the end of the projects, such consent would have been withheld and GAIC would have instead requested that final payment be sent to GAIC "because we have had issues on the job." Beach did not explain why, if GAIC knew about "issues on the job" before the

July 1, 2004—many months after Shoff submitted its final Applications for Payment on September 4, 2003 (Sheridan), and November 24, 2003 (Hillcrest)—that GAIC informed Norwin that it had received bond payment claims totaling nearly $800,000.00, roughly the same amount that Shoff said was "lost" on the projects.

## II. PROCEEDINGS

### A. *The Claims*

Invoking the District Court's diversity jurisdiction, GAIC filed suit against Norwin on August 4, 2004, alleging that Norwin breached both of the Shoff Contracts by failing to obtain GAIC's consent before making final payments to Shoff. According to GAIC, the final payment under each of the contracts should have been equal to five percent (5%) of the contract price, the amount of retainage allegedly required at the time of final payment. As alleged by GAIC, "[Norwin's] failure, as . . . bond obligee and stakeholder, to obtain [GAIC's] consent prior to paying Shoff, impaired [GAIC's] security to the extent that the retainage was improperly paid." Under the doctrine of equitable subrogation, GAIC sought damages in the total amount of $467,342.06, an amount equal to five percent (5%) of the combined Sheridan and Hillcrest contract prices.

After unsuccessfully moving to dismiss GAIC's

_____

job was finished, timely notice was not given to Norwin, Foreman, or Cunzolo.

18

complaint, Norwin filed a counterclaim against GAIC, alleging that GAIC had breached its responsibility to remedy Shoff's incomplete and/or defective work. Norwin also filed a third-party complaint against Shoff and Foreman, alleging that (1) Shoff had breached the Shoff Contracts by failing to pay its suppliers and subcontractors; (2) Shoff had breached the Shoff Contracts by failing to correct and complete, with the warranty period, incomplete and defective work; (3) Foreman had breached the CM Contract by failing to "produce and obtain the necessary documentation and certify the same with respect to payments to [Shoff];" and (4) Foreman was negligent in its provision of construction management services. Norwin asserted that Shoff and Foreman were either "solely liable to [GAIC] for any damages allegedly sustained by [GAIC]," or they were "jointly and severally liable with [Norwin] and/or liable over to [Norwin] or directly liable for contribution and/or indemnity." [8]

---

[8] As conceded at oral argument, the record does not support—and Norwin is not pursuing—claims of indemnification and contribution against Foreman. Foreman has not raised—and we do not consider—whether Norwin's breach of contract claim against Foreman states a proper claim under Rule 14 of the Federal Rules of Civil Procedure. *See e.g., American Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2007) (explaining that "Rule 14(a) does not allow a third-party complaint to be founded on a defendant's independent cause of action against a third-party defendant, even though arising out of the same occurrence underlying plaintiff's claim").

After answering Norwin's third-party complaint, Foreman filed a cross claim against Shoff, seeking contribution and indemnity from Shoff. Shoff in turn filed a cross-claim against Foreman and a counterclaim against Norwin. For whatever reason, Cunzolo was left out of the fray.

## B. *The GAIC-Norwin-Shoff Agreement*

On November 30, 2005, all parties—GAIC, Norwin, Shoff, and Foreman—filed cross-motions for summary judgment. Soon after, unbeknownst to both the District Court and Foreman, the other three parties—GAIC, Norwin, and Shoff—signed a settlement agreement[9] (the "Settlement Agreement") that provided as follows:

> 1. Norwin agreed not to oppose GAIC's motion for summary judgment on the issue of liability.
>
> 2. Norwin agreed not to oppose GAIC's motion for summary judgment on the issue of damages. Not only did Norwin agree not to contest the amount requested by GAIC, namely, $467,362.06; but it also agreed not to assert that those damages should be reduced by (a) the value of any collateral taken by GAIC from Shoff; and (b) any

---

[9] The copy of the agreement that appears in the record contains the signatures of GAIC's and Norwin's representatives. The signature line for Shoff is blank. It is undisputed, however, that Shoff was a party to the agreement.

monies paid to GAIC by its underwriter Seubert & Associates, Inc., under the Agency Agreement or the Surety Profit Sharing Agreement.

3. Shoff agreed to undertake all corrective measures requested by Norwin.

4. Norwin agreed to release GAIC from any liability to Norwin with respect to all bonds executed by GAIC as surety to Shoff, the principal, and to Norwin, the obligee, including all those claims that were asserted and could have been asserted in the litigation.

5. Norwin agreed to retain—at no cost to Norwin—GAIC's counsel after GAIC's unopposed motion for summary judgment was granted. GAIC's counsel would then pursue Norwin's claims against Foreman. Norwin agreed that it would turn over to GAIC any amounts that it might obtain from Foreman through judgment or settlement.

6. Norwin agreed to voluntarily dismiss its claims against Shoff.

7. In the event GAIC's counsel was unable to obtain a judgment against Foreman on Norwin's behalf, GAIC agreed "to satisfy of record [GAIC's

judgment against Norwin] upon the occurrence of one of the following: (1) the expiration of sixty days after the entry of a final, non-appealable judgment in favor of Foreman; or (2) the expiration of sixty days after Foreman establishes, to the satisfaction of GAIC, that Foreman and its insurance carrier are unable to pay the amount of any judgment entered in favor of Norwin's claims against Foreman in this Litigation."  This provision appears to say, and the parties have since conceded that it means, that Norwin will not have to satisfy the judgment obtained by GAIC against Norwin.

8.  GAIC, Norwin, and Shoff agreed to cooperate in the litigation against Foreman.

## C. *The Rulings*

On February 13, 2006, the Magistrate Judge entered a report and recommendation addressing the four motions for summary judgment that were filed on November 30, 2005.  The Magistrate Judge did not then know about the GAIC-Norwin-Shoff Settlement Agreement.  Noting that Norwin altogether failed to respond to GAIC's motion for summary judgment, the Magistrate Judge recommended that summary judgment be entered in GAIC's favor on GAIC's claims against Norwin and on Norwin's counterclaims against GAIC.  With respect to Norwin's and Foreman's cross-motions for summary judgment (regarding Norwin's third-party claims against Foreman), the Magistrate Judge recommended that summary judgment be

22

granted in Foreman's favor on Norwin's third-party negligence claims and in Norwin's favor—as to liability—on Norwin's third-party breach of contract claims. With respect to Shoff's motion for summary judgment against Foreman (regarding Foreman's cross-claims against Shoff), the Magistrate Judge recommended that summary judgment be entered in Shoff's favor.

The District Court adopted the Magistrate Judge's report and recommendation by order docketed March 20, 2006. Neither the District Court nor Foreman had yet been informed about the Settlement Agreement. Shoff later withdrew its cross-claim against Foreman, and Norwin and Shoff withdrew their claims against each other.

By motion filed April 18, 2006, GAIC requested entry of judgment against Norwin in the total amount of $701,456.38, which amount included $467,342.06, plus "attorney's fees, costs, and other damages under the Public Contractor and Subcontractor Payment Act, 62 Pa. C.S.A. § 3931." The next day, Norwin filed a motion for entry of judgment against Foreman, arguing that Foreman was "liable over" to Norwin for the summary judgment granted to GAIC on March 20, 2006, a judgment purportedly requiring Norwin to pay $467,342.06, plus "attorney's fees, costs, and other damages." Norwin thereafter responded to GAIC's motion for entry of judgment by stating that it would not contest the amounts sought by GAIC, "so long as the Court enters Judgment in its favor and against Foreman in the same amount, as requested in Norwin's Motion for Judgment."

23

Foreman first learned about the GAIC-Norwin-Shoff Settlement Agreement at a status conference held before the Magistrate Judge on April 18, 2006. Foreman thereafter filed a counter-motion to GAIC's and Norwin's motions for entry of judgment, asserting that the District Court's previous order granting summary judgment to Norwin against Foreman should be vacated based on the secret Settlement Agreement. Foreman also moved to amend its affirmative defenses to Norwin's third-party claims. Specifically, Foreman sought leave to add three affirmative defenses, one each based on: (1) GAIC's agreement to forebear from executing on its judgment against Norwin, thereby relieving Norwin from having to pay any damages; (2) Norwin's failure to mitigate damages; and (3) GAIC's and Norwin's agreement, which purportedly released or extinguished Norwin's claims against Foreman.

In a memorandum order dated June 8, 2006, the Magistrate Judge noted as follows:

> Great American and Norwin argue that Foreman is liable over to Norwin for the amount that Norwin owes Great American. However, the Court has not determined what the amount is that Norwin owes Great American and, even if they [Great American and Norwin] were to unequivocally agree upon an amount, such an agreement would not be binding upon a third party. Moreover, that argument appears to be based on an indemnity theory which, as explained above, is not the basis for Foreman's liability.

The Magistrate Judge accordingly dismissed Norwin's motion for entry of judgment as premature and deferred GAIC's motion for entry of judgment, stating that the motion "will be considered by the Court if and when Norwin unconditionally consents to the entry of judgment against it." The Magistrate Judge also denied Foreman's motion to amend its affirmative defenses on the ground that the proposed amendment would be futile. In the Magistrate Judge's words: "[B]ecause Foreman's liability to Norwin is based on Foreman's breaches of its contractual obligations and not on a theory of indemnification, the provisions of the Agreement would not have made any difference in this case." Finally, the Magistrate Judge denied Foreman's counter-motion to set aside the district court's March 20 order regarding the parties' cross-motions for summary judgment. According to the Magistrate Judge, "the issue of liability has been established and all that remains to be determined is the amount of damages."

On June 19, 2006, GAIC filed an amended motion for entry of judgment against Norwin. In its amended motion, GAIC requested entry of judgment in the amount of $467,342.06, plus prejudgment interest. After Norwin advised the District Court that it did not oppose the motion, the District Court entered an order dated September 1, 2006, directing entry of judgment in favor of GAIC and against Norwin "in the amount of $467,342.05 [sic] together with prejudgment interest."

On June 20, 2006, Norwin filed an amended motion for entry of judgment against Foreman, this time requesting judgment in the amount of $467,342.06 plus interest. As he did

with Norwin's earlier motion for entry of judgment, the Magistrate Judge dismissed the amended motion as premature. Norwin thereafter filed a motion for summary judgment on damages, arguing that Foreman owed $467,342.05, the amount of the judgment already entered in GAIC's favor and against Norwin. On November 13, 2006, the Magistrate Judge recommended that Norwin's motion for summary judgment as to damages be denied. The Magistrate Judge wrote:

> Norwin cannot sustain this burden [of proving its damages] by referring to a judgment entered against it, with its consent, by Great American. Although Great American and Norwin can agree to Norwin's liability, such an agreement is not binding on third parties. Nor can Norwin succeed by proffering an agreement reached between other parties when Foreman has presented testimony that Norwin will not be making payments to Great American as a result of this agreement.

The District Court later adopted the Magistrate Judge's report and recommendation and denied Norwin's motion for summary judgment as to damages. A jury trial on damages was scheduled to begin on April 16, 2007.

As the case proceeded toward a trial on Norwin's damages, Norwin and Foreman filed a number of motions in limine. On April 5, 2007, the District Court ruled on these motions, ordering, among other things, that (1) neither party would be permitted to introduce the GAIC-Norwin-Shoff Settlement Agreement into evidence, the agreement being

"irrelevant to the merits of the instant dispute;" (2) Norwin could introduce evidence of the judgment in favor of GAIC and against Norwin, as well as evidence of the retainage amounts paid to Shoff, in order to establish its damages; (3) Foreman would not be permitted to argue that, because Norwin would never have to pay the GAIC judgment, Norwin suffered no damages; (4) Foreman would be permitted to introduce evidence to establish that Norwin failed to mitigate its damages; and (5) Norwin would not be permitted to present evidence regarding Foreman's insurance coverage. In essence, the District Court concluded that, "[t]o put Norwin in the same position that it would have been had Foreman performed [the CM Contract] properly, the Great American judgment against Norwin must be satisfied." The District Court determined—in other words—that "the entry of judgment against Norwin is sufficient evidence of its damages."

Several days before trial began, Foreman submitted an offer of proof regarding evidence that it wished to introduce at trial. On the morning of trial, the District Court addressed Foreman's offer of proof by ruling that Foreman could not introduce (1) the Settlement Agreement to show bias or prejudice on the part of "any witnesses who are employees, agents, or representatives of the signatories to the said settlement agreement;" (2) evidence that Norwin's damages were caused by Shoff's alleged misrepresentations; (3) evidence that Norwin caused its own damages by failing to abide by the provisions of the Shoff Contracts; (4) evidence that Norwin breached its CM Contract with Foreman by assigning rights under that contract to Great American; and (5) the deposition testimony of Superintendent Boylan, indicating that Norwin

27

expected that "not one dime of school district money would be used toward payment of the judgment [in favor of GAIC]." At the same time, the District Court granted Norwin's motion in limine to exclude all evidence (1) that Shoff breached its contract with Norwin and/or committed fraud; (2) that Norwin failed to mitigate its damages by not pursuing claims against Shoff; (3) that Norwin failed to mitigate its damages by not contesting the amount of damages claimed by GAIC; and (4) that GAIC had a potential, but speculative, right of recovery against Shoff through a security interest granted to GAIC by Charles and Melanie Shoff.

During trial, over Foreman's objection, the District Court took judicial notice of the uncontested judgment entered against Norwin in the amount of $467,342.05. Norwin's business manager testified that the amount of the judgment was equal to the amount of the retainage (5%) that was improperly released to Shoff. Other than introducing the certified payment applications documenting the release of the five percent (5%) retainage, Norwin presented no other evidence of its damages. Indeed, when instructing the jury, the District Court stated: "The Court has taken judicial notice of the judgment in favor of Great American Insurance Company against Norwin School District. Therefore, Norwin School District need not produce any other formal proof of the existence or amount of its damages." Not surprisingly, the jury returned a verdict in favor of Norwin and against Foreman in the amount of $467,347.05, plus six percent

28

(6%) interest from July 1, 2004.[10] On April 19, 2007, consistent with the jury's verdict, the District Court entered judgment in favor of Norwin in the amount of $467,347.05, plus six percent (6%) interest from July 1, 2004. This timely appeal followed.[11]

## III. DISCUSSION

In its notice of appeal filed May 10, 2007, Foreman stated that it was appealing from (1) the judgment entered on the jury's verdict; (2) the ruling on summary judgment docketed March 20, 2006, granting summary judgment in favor of GAIC against Norwin, in favor of Norwin against Foreman (as to liability), and in favor of Shoff against Foreman;[12] (3) the order docketed September 1, 2006, entering judgment in favor of GAIC and against Norwin in the amount of $467,342.05; and (4) the order docketed April 5, 2007, on motions in limine.

---

[10] The jury awarded $467,34**7**.05, which is five dollars more than the figure used in the September 1 judgment. Apparently, no one complained about the jury's error.

[11] The district court exercised jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1367. Appellate jurisdiction exists under 28 U.S.C. § 1291.

[12] Although Foreman appealed from the order granting Shoff's motion for summary judgment against Foreman, Foreman has abandoned its appeal against Shoff. Foreman not only failed to address the Shoff ruling in its appellate brief, but it also advised this Court at oral argument that it was not pursuing its appeal against Shoff.

Because this is a diversity case, we apply the substantive law of Pennsylvania. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).

## A. *Contract Interpretation*

The Pennsylvania Supreme Court summarized Pennsylvania law as it relates to contract interpretation in *Murphy v. Duquesne University*, 777 A.2d 418 (Pa. 2001).

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not

resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Id.* at 429-30 (internal quotation marks and citations omitted). We exercise plenary review over questions of contract interpretation. *Local Union No. 1992 v. Okonite Co.*, 189 F.3d 339, 341 (3d Cir. 1999).

1. *Reduction of Retainage*

An issue central to this case is whether GAIC's consent was required before retainage fell below five percent (5%) of the combined final prices of the two projects. The contracts provided that GAIC's consent was required before "final payment." Norwin and GAIC contend that the contracts required Norwin to retain a full five percent (5%) of the total contract prices until the time of final payment, at which time GAIC's consent was purportedly required.[13] Foreman argues

---

[13] It bears noting that all four of the parties to the various construction contracts—Shoff, Cunzolo, Foreman, and Norwin—participated in the decision to gradually reduce the retainage below five percent (5%). Shoff submitted Applications for Payment with the reduced retainage amounts

otherwise. The District Court never addressed the issue, assuming, instead, that an amount equal to five percent (5%) of the total contract prices was a proper measure of what the final payment should have been.

We begin with the Hillcrest contracts. The relevant language in the Shoff Contract–Hillcrest ("Hillcrest Contract") provided as follows:

> 5.6 Subject to the provisions of the Contract Documents [namely, the Shoff Contract plus the General and Supplementary Conditions], the amount of each progress payment shall be computed as follows:
>
> 5.6.1. Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the total Contract Sum allocated to that portion of the Work in the Schedule of Value, less retainage of ten percent (10%). . . .
>
> 5.6.2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for

---

listed; Foreman and Cunzolo both certified the Applications for Payment with the reduced retainage amounts; and Norwin paid Shoff amounts that clearly reflected the reduced retainage.

32

subsequent incorporation in the completed construction . . . , less retainage of ten percent (10%).

. . . .

Article 5.6 of the Hillcrest Contract thus set the amount of retainage applicable to progress payments at ten percent (10%).

As provided in Article 5.7 of the Hillcrest Contract, the amount of retainage was subject to modification:

5.7 The progress payment amount determined in accordance with Paragraph 5.6 shall be further modified under the following circumstances:

5.7.1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to ninety-five percent (95%) of the Contract Work, less such amounts as the Construction Manager recommends and the Architect determines for incomplete Work and unsettled claims.

While it appears that Article 5.7.1 required the eventual release of one-half of the amounts previously retained, i.e., one-half of the ten percent (10%) retainage, the timing of the release was left unclear because the Hillcrest Contract failed to define the phrase "Substantial Completion of the Work."

Article 5.8 of the Hillcrest Contract provided that "[i]f it

33

is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Subparagraphs 5.6.1. and 5.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation."  Because no percentage was inserted in Article 5.8 of the Hillcrest Contract, we look "elsewhere in the Contract Documents" for guidance. Indeed, in the Supplementary Conditions, retainage was specifically addressed as follows:

> 9.3.6:  The sum or sums withheld by [Norwin] from  [Shoff] shall be 10 percent of the amount due [Shoff] until 50 percent of the Contract is completed.  When the Contract is 50 percent complete, one-half of the amount retained by [Norwin] shall be released to [Shoff], provided that [Cunzolo] approves the Application for Payment; and provided further, that [Shoff] is making satisfactory progress and there is no specific cause for greater withholding.

> 9.3.7:  The sum or sums withheld by [Norwin] from [Shoff] after the Contract is 50 percent completed shall not exceed 5 percent of the value of completed work based on monthly progress payment requests.

The first sentence in Article 9.3.6 made very clear that ten percent (10%) retainage was required until the project was fifty percent (50%) complete.  The words "shall be 10 percent" were unequivocal.  The second sentence in Article 9.3.6

34

provided that, <u>when</u> the project was fifty percent (50%) complete, and with certain provisos, one-half of the amounts previously retained "shall be released." Such release presumably served to increase the total payments to Shoff to ninety-five percent (95%) of the then-completed work, leaving Norwin with five percent (5%) retainage at the fifty percent (50%) completion mark.

In addressing the sums to be withheld <u>after</u> the work was fifty percent (50%) complete, Article 9.3.7 did not use the "shall be" language that was used in Article 9.3.6. Instead, Article 9.3.7 provided that retainage "shall not exceed 5 percent" after the project was fifty percent (50%) complete. While the words "shall be 10 percent" drew a bright line, permitting no variation in the amount of retainage <u>before</u> the work was fifty percent (50%) complete, the words "shall not exceed 5 percent" left room for a range of retainage values—capped at five percent (5%)—<u>after</u> the work was fifty percent (50%) complete.

The Supplementary Conditions were expressly incorporated into, and constituted a vital part of, the Hillcrest Contract. Like the General Conditions, the Supplementary Conditions supplied details that were not contained in the Hillcrest Contract itself. With respect to retainage, the detail provided by the Supplementary Conditions was not inconsistent with any other provision in the Hillcrest Contract. We must, accordingly, give effect to the retainage provision contained in the Supplementary Conditions. As noted above, that provision stated that "[t]he sum or sums withheld by [Norwin] from [Shoff] after the Contract is 50 percent completed shall not exceed 5 percent of the value of completed work." We cannot

35

assume that the language used in the retainage provision was chosen carelessly; we cannot ignore the difference in meaning between the words "shall not exceed" and the words "shall be;" and we cannot distort the unambiguous meaning of the words "shall not exceed." Applying—as we must—the rules of contract interpretation, we conclude that the Hillcrest Contract did <u>not</u> require five percent (5%) retainage at the time of final payment.[14] Thus, after the projects were more than fifty percent (50%) complete, Foreman and Cunzolo were permitted to certify payments with less than five percent (5%) retainage, and Norwin was permitted to make payments to Shoff with less than five percent (5%) retainage, all without the consent of surety.

We are not persuaded otherwise by the arguments of Norwin and GAIC. According to Norwin and GAIC:

> By stating that sums withheld "shall not exceed 5 percent," Paragraph 9.3.7 is consistent with Paragraph 9.3.6 of the General [sic] Conditions and the payment provisions in the contracts themselves which directed that first 10% and then

---

[14] Our conclusion is buttressed by Article 9.10.2 of the General Conditions, which addresses the conditions precedent to final payment as follows: "Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect through the Construction Manager" certain documents. The phrase "any remaining retained percentage" suggests that the percentage of retainage at the time of final payment could vary.

> 5% shall be retained.  In no way did Paragraph
> 9.3.7 overrule the clear directive that retainage
> shall be 5%.

In fact, there was no "clear directive" in the Hillcrest Contract that retainage "shall be 5%" at the time of final payment. Indeed, the only directive concerning a reduction in retainage appeared in Article 9.3.7 of the Supplementary Conditions, and that directive did not specify that retainage "shall be" five percent (5%) until the project was complete.

Nor are we persuaded by Norwin's and GAIC's suggestion that the words "shall not exceed" should be construed to mean "shall be."  The use of different language to address the same or similar issue—namely, retainage—strongly implies that a different meaning was intended.  In fact, it would have been quite easy to draft the requirements for retainage, both above and below the fifty percent (50%) completion mark, using the same "shall be" language.  The same language was <u>not</u> used, however; and we must assume that the choice of different words was deliberate.  *See, e.g, Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156-57 (10th Cir. 2007) (noting that, "[w]hen a contract uses different language in proximate and similar provisions, we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings"); *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (noting that "when parties to the same contract use such different language to address parallel issues . . ., it is reasonable to infer that they intend this language to mean different things"); *see also Commonwealth v. Berryman*, 649 A.2d 961, 969 (Pa.

37

Super. Ct. 1994) (recognizing the rule that, when different language is used in parallel provisions of a statute, the provisions are intended to mean different things). In plain terms, by using the words "shall not exceed" instead of "shall be," Article 9.3.7 of the Supplementary Conditions set a ceiling on the monies to be retained during the second half of the project; it did not "direct" that retainage be five percent (5%) at the time of final payment.

We are also unconvinced by Norwin's and GAIC's protection-of-the-surety argument. According to Norwin and GAIC, the only reasonable construction of the contract documents is a construction that affords meaningful security and protection to the surety—and that purportedly means requiring five percent (5%) retainage at the time of final payment.[15] As

---

[15] We note that a surety is not necessarily without protection when a construction contract makes retainage permissive rather than obligatory. A surety, for example, can protect itself by issuing a notice to the obligee that the contractor is in default and/or that claims have been made against the surety. Such notice places the obligee in the role of a stakeholder, with a duty to protect the surety by withholding payments to the contractor. *See, e.g.*, *American Ins. Co. v. United States*, 62 Fed. Cl. 151, 155 (2004) (noting that, under the doctrine of equitable subrogation, "notice [by the surety] that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the [obligee] to a stakeholder with duties to the surety," allowing the surety to sue the obligee for recovery of contract funds owed but not yet

the case law makes clear, however, the Court may not rewrite the contracts to provide protections that the contracts did not themselves provide. *See, e.g.*, *Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. Ct. 1993) (noting that "the parties have the right to make their own contract, and it is not the function of a court to rewrite it or to give it a construction in conflict with the accepted and plain meaning of the language used").

Norwin and GAIC cite three cases in support of their argument that Norwin "had no discretion" to reduce retainage below five percent (5%) prior to final payment. *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227 (1896); *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542 (Fed. Cir. 1997); *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308 (1994). None of the cited cases involved the issues and/or the contract terms that are before this Court. In *Prairie State National Bank*, 164 U.S. at 230-40, the Supreme Court considered the relative priorities of parties competing for retainage held by the government under a construction contract. In *National Surety Corp.*, 118 F.3d at 1545, the Federal Circuit held that, by improperly releasing retainage in violation of clear contractual terms, the government incurred liability to the surety. In *Transamerica Premier Insurance Co.*, 32 Fed. Cl. at 313-16, the Court of Federal Claims held that the government was liable to the surety for payments that the government wrongly issued to the contractor after the government was put on notice regarding the contractor's financial inability to complete the contract. To be sure, in each of these cases, the courts recognized, as a general proposition, that contract retainage serves to protect not only the obligee but also the

---

paid). If, as GAIC's representative testified, GAIC knew before the projects were completed that there were "issues on the job," GAIC could have protected itself by notifying Norwin.

surety. None of these cases, however, supports Norwin's and GAIC's assertion that, under the terms of the Contract Documents at issue here, Norwin was required to retain five percent (5%) of the contract price until the time of final payment.

The Sheridan Contract differed from the Hillcrest Contract in one important respect: namely, the words "[r]educe to 5% at 50% of work installed" were inserted in Article 5.8 of the Sheridan Contract to explain any "[r]eduction or limitation of retainage." In contrast, no provision for reduction or limitation of retainage was inserted in Article 5.8 of the Hillcrest Contract. We must decide whether the added insertion in the Sheridan Contract leads to a different conclusion regarding the amount of retainage that was required at the time of final payment.

In construing the Sheridan Contract, we must consider the entirety of the contract documents, including the Supplementary Conditions; and we must read the contractual provisions to avoid ambiguities if possible. *Masters v. Celina Mut. Ins. Co.*, 224 A.2d 774, 115 (Pa. Super. Ct. 1966). We must also keep in mind that specific provisions ordinarily control more general provisions. *In re Alloy Mfg. Co. Employees Trust*, 192 A.2d 394, 396 (Pa. 1963).

Here, the words inserted in Article 5.8 of the Sheridan Contract—"[r]educe to 5% at 50% of work installed"—must be read in conjunction with the more detailed retainage provisions contained in the Articles 9.3.6 and 9.3.7 of the Supplementary Conditions. By themselves, the words "[r]educe to 5% at 50% of work installed" were ambiguous. For example, those words could have meant that any limitation—or ceiling—on retainage was reduced to five percent (5%) at the fifty percent (50%) completion mark, or those words could have meant that

40

retainage was reduced to, and would remain at, five percent (5%) at and after the fifty percent (50%) completion mark. Any ambiguity was eliminated, however, if the words were considered in conformity with the more detailed Supplementary Conditions. The Supplementary Conditions provided that, while retainage was to be reduced to five percent (5%) when work was fifty percent (50%) complete, retainage was thereafter to be capped at five percent (5%). If the words "[r]educe to 5% at 50% of work installed" were construed to mean that retainage was limited to, or could not exceed, five percent (5%) after the project was fifty percent (50%) complete, the words would be consistent with the clear provisions contained in Articles 9.3.6. and 9.3.7. So construed, the insertion did nothing more than provide, in broad terms, what the Supplementary Conditions provided more explicitly.

In sum, we find that the Supplementary Conditions—specifically Articles 9.3.6 and 9.3.7—controlled the matter of retainage on both the Sheridan and the Hillcrest projects. Because the Supplementary Conditions did nothing more than place a five percent (5%) ceiling on retainage once the projects were fifty percent (50%) complete, we conclude—as to both projects—that five percent (5%) retainage was not required at the time of final payment, that GAIC's consent was not required before retainage could be reduced to amounts less than five percent (5%), and that Foreman, accordingly, did not breach its contract with Norwin by failing to obtain GAIC's consent before certifying Shoff's progress payment applications reflecting retainage of less than five percent (5%).

2. *Consent of Surety*

Article 9.10.2 of the General Conditions provided that "[n]either final payment nor any remaining retained percentage

41

shall become due until the Contractor submits to the Architect through the Construction Manager . . . consent of surety, if any, to final payment." Foreman now argues—as it argued before the district court—that the Contract Documents required Shoff to submit the consent of surety if, and only if, the surety reserved such right in the bond documents. In this case, the bond documents were silent as to any consent-of-surety requirement.[16]

In support of its argument, Foreman cites *Exchange National Bank of Chicago v. United States Fidelity & Guaranty Co.*, No. 81C7119, 1985 WL 2123, *1 (N.D. Ill. July 25, 1985). In that case, the court construed a contract provision stating that "[n]either the final payment nor the remaining retained percentage shall become due until the Contractor submits to the Architect . . . consent of the surety, if any, to final payment." *Id.* The court concluded that the contract provision itself did not require the surety's consent to final payment. Instead, the court determined that the words "if any" in the phrase "consent of surety, if any, to final payment" indicated that a consent-of-surety requirement must be found elsewhere, perhaps in the bond documents. *Id.*

We know of no other court that has followed the decision in *Exchange National Bank*. Nor are we persuaded to follow the decision ourselves. Indeed, we conclude that the words "if any" in the phrase "consent of surety, if any, to final payment" were meant to qualify the word "surety," meaning that, if and when a surety was involved, the surety's consent to final payment was

---

[16] The record establishes that Foreman's project managers were well aware that the surety's consent was needed as part of the close-out documentation.

required.[17]  Here, a surety—GAIC—was involved, and GAIC's consent to final payment was required.  *See Capital Indemnity Corp. v. Price Municipal Corp.*, No. 2:99cv0141, 2002 WL 818064 (D. Utah April 25, 2002) (assuming, without discussion, that the surety's consent to final payment was required when the contract provided that "final Application for Payment shall be accompanied . . . by . . . consent of the surety, if any, to final payment").

## 3.  *Final Payment*

Because the Shoff Contracts required the consent of surety to "final payment," we must consider the meaning of the words "final payment."  Unfortunately, the contract documents provided no clear definition of those words.  Article 6 of the Shoff Contracts provided that final payment constituted "the entire unpaid balance of the Contract Sum."  Article 9.10.1 of the General Conditions provided that the final Certificate of Payment should state "the entire balance found to be due the Contractor."  Article 9.10.2 of the General Conditions provided that "[n]either final payment nor any remaining retained percentage shall become due until . . . consent of surety, if any, to final payment" was obtained.  In essence, the contract documents allowed "final payment" to mean whatever the final Certificate of Payment said it was.

Foreman contends that, as to the Hillcrest project, "final payment" was $78,362.65, the amount requested by Shoff on the

---

[17]  We note that AIA Form G706, entitled "Contractor's Affidavit of Payment of Debts and Claims," stated that "[w]henever Surety is involved, Consent of Surety is required."  Although AIA Form G706 was used in this case, the form was not incorporated into the Contract Documents and was, therefore, not binding on Foreman.

43

Final Application for Payment. That amount equaled the difference between the final contract price ($5,615,267.11) and the total amounts previously paid ($5,536,904.46). Shoff's Final Application for Payment was certified by Foreman and paid by Norwin on December 16, 2003. The check issued by Norwin on that date was marked "FINAL." We agree with Foreman that "final payment" on the Hillcrest project was $78,362.65.

As to the Sheridan project, Foreman argues that no "final payment" was ever made. In support of its argument, Foreman points to the $5,000.00 that was "retained" from Shoff's final Application for Payment. Indeed, Shoff requested a final payment of $24,961.17, the difference between the final contract price ($3,731,574.000 and the total amounts previously paid ($3,706,612.83). While Foreman certified the amount requested by Shoff, Norwin paid Shoff only $19,961.17 (by check dated November 26, 2003). According to Foreman, Norwin withheld the $5,000.00 for uncompleted work. The record is otherwise silent about what alerted Norwin to the need to withhold a portion of the certified amount.

That Norwin withheld $5,000.00 from the amount requested by Shoff in its final Application for Payment does not change the fact that the final Certificate of Payment reflected a "final payment" of $24,961.17, the remainder of what was owed under the Sheridan Contract. Foreman certified final payment in the amount of $24,961.17, and—under the Contract Documents—that certification constituted a representation that the consent of surety had been obtained. Thus, for purposes of the consent-of-surety requirement on the Sheridan project, "final payment" was $24,961.17.

## B. *Breach*

Foreman contends that the District Court erred in

44

entering summary judgment in Norwin's favor on the issue of Foreman's liability for breach of contract. The Magistrate Judge recommended that Norwin's motion for summary judgment be granted on the basis that there were "no genuine issues of material fact that Foreman failed to provide close-out documents, including the Consent of Surety." The District Court adopted the Magistrate Judge's recommendation regarding Foreman's liability for breach of contract. Because breach of a contract is essentially a question of contract interpretation, our review is plenary. *St. John Mortgage Co. v. United States Fidelity and Guar. Co.*, 897 F.2d 1266, 1268 (3d Cir. 1990).

Foreman admits that it failed to obtain GAIC's consent before it certified Shoff's final Applications for Payment. Under Articles 9.10.1 and 9.10.2 of the General Conditions, Foreman was required to obtain GAIC's consent as a condition precedent to final payment to Shoff. By issuing final Certificates of Payment without such consent, Foreman clearly breached the terms of the contract documents.

Foreman contends that, because Norwin itself breached the terms of the contracts, Norwin should not be permitted to demand Foreman's strict adherence to the contractual terms. Foreman refers specifically to Norwin's act of issuing final payment to Shoff on the Hillcrest project without first obtaining Cunzolo's certification. The Magistrate Judge rejected this argument, stating, without explanation, that "Great American's damages were not the result of Norwin's failure to obtain Cunzolo's certification for the Final Payment Application on the Hillcrest project." The Magistrate Judge did not mention that, as to the final Certificate of Payment, the contract documents treated Cunzolo and Foreman alike; both were required to certify that all conditions precedent to final payment—which included having the consent of surety—had been fulfilled.

45

In practice, Cunzolo apparently did not review the close-out documentation before reviewing and certifying Shoff's final Applications for Payment. According to Hank Tkacik ("Tkacik"), the Cunzolo representative responsible for signing the various Applications for Payment, Foreman did not forward the close-out documentation to Cunzolo because of its volume. Thus, Tkacik's review of the final Applications for Payment did not include verification that all of the close-out documentation had been submitted. The procedure used on both projects was as follows: (1) Foreman would review the Applications for Payment, certify payment, then send the certified Applications for Payment to Norwin; (2) upon receipt of the certified Applications for Payment, Norwin would notify Tkacik, who would go to Norwin's offices to sign the Applications; and (3) Norwin would then issue payment to Shoff. Tkacik had no recollection about why he failed to sign the final Application for Payment on the Hillcrest project. He stated that, consistent with his certification on the Sheridan project, he would have signed the final Application for Payment on Hillcrest because Shoff's work had progressed to a point entitling it to final payment.

We are unconvinced that the District Court erred in rejecting Foreman's attempt to excuse its breach by pointing to Norwin's failure to obtain Cunzolo's signature before issuing final payment on the Hillcrest project. Norwin, Cunzolo, and Foreman all apparently acquiesced in a procedure that resulted in Foreman's being the only party that, in fact, reviewed the close-out documentation. Foreman cannot now complain about a procedure that it endorsed.

## C. *Damages*

Foreman challenges a number of the District Court's evidentiary rulings with respect to damages. This Court generally reviews evidentiary decisions for abuse of discretion;

46

however, to the extent an evidentiary decision involves a legal component, this court's review is plenary. *Inter Med. Supplies, Ltd. v. EBI Med. Systems, Inc.*, 181 F.3d 446, 464 (3d Cir. 1999). An erroneous evidentiary ruling will be considered harmless if "it is highly probable that the district court's [ruling] did not affect [the party's] substantial rights." *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 179 (3d Cir. 2000).

Among other things, Foreman challenges the District Court's motion-in-limine ruling that entry of judgment against Norwin in GAIC's first-party action was admissible in Norwin's third-party action as evidence of damages caused by Foreman. At trial, consistent with its ruling in limine, the District Court took judicial notice of the uncontested judgment against Norwin in the amount of $467,342.05, then instructed the jury as follows: "The Court has taken judicial notice of the judgment in favor of Great American Insurance Company against Norwin School District. Therefore, Norwin School District need not produce any other formal proof of the existence or amount of its damages."

We note initially that Foreman was not a party to the uncontested judgment against Norwin. Accordingly, the judgment was not binding on Foreman. The Magistrate Judge correctly explained what the District Court failed to recognize: "Norwin cannot sustain th[e] burden [of proving its damages] by referring to a judgment entered against it, with its consent, by Great American. Although Great American and Norwin can agree to Norwin's liability, such an agreement is not binding on third parties."

Furthermore, the amount of the judgment was the unchallenged product of GAIC's and Norwin's behind-the-scenes Settlement Agreement. Norwin agreed not to oppose GAIC's motion for summary judgment in the amount of

47

$467,362.06; in return, GAIC agreed not to seek satisfaction of the judgment from Norwin unless Norwin first obtained a judgment and received payment from Foreman. From Norwin's perspective, it mattered little, if at all, what amount was plugged into an uncontested judgment that required no payment from Norwin's pockets.

Indeed, knowing that it would never have to pay the judgment, Norwin had little incentive to challenge the amount of damages sought by GAIC. That amount, moreover, was subject to at least one meritorious defense that Norwin never raised. Norwin could have challenged, for example, GAIC's erroneous interpretation of the contract language. As we have already explained, the contract documents did not require GAIC's consent before retainage was reduced to amounts less than five percent of the total contract prices. GAIC's consent was required before "final payment;" and—for consent-of-surety purposes—"final payment" was $78,362.65 on the Hillcrest project and $24,961.17 on the Sheridan project. The combined total of improperly released payments was thus

$103,323.82, not $467,362.06.[18] Norwin was certainly free to

---

[18] There may have been other meritorious defenses as well. For example, GAIC's actual damages would be less than $103,323.82 if the evidence revealed that GAIC was not prejudiced by the unauthorized release of final payments to Shoff. In *National Security Corp.*, the court explained that, if the unauthorized payments "were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated." *Id.* at 1548 (concluding that a surety seeking money damages for an obligee's improper release of funds must establish prejudice); Ramada Devel. Co. v. United States Fidelity & Guar. Co., 626 F.2d 517, 521 (6th Cir. 1980)

agree to an inflated judgment, but that inflated judgment was <u>not</u> an appropriate—or relevant—measure of damages caused by Foreman.[19]  Clearly, the District Court abused its discretion in admitting GAIC's uncontested judgment as evidence of damages caused by Foreman.

Not only did the District Court admit, over Foreman's objection, the uncontested judgment as the sole evidence of Norwin's damages; it also denied Foreman's request to introduce evidence to challenge that judgment.  By doing so, the District Court, in effect, directed a verdict against Foreman in an amount

---

(noting that a compensated surety is not entitled to pro tanto discharge following improperly released retainage unless the surety experiences some injury, loss or prejudice).  Here, Charles Shoff stated during his deposition that the payments his company received from Norwin were used to pay subcontractors and vendors.  Shoff also stated that the projects lost approximately $800,000—roughly the amount GAIC had to pay on the bonds.  Such deposition testimony tends to demonstrate that GAIC's bond payments were the result of project losses and not the result of Norwin's improper release of the final payments.

[19] While we agree that the $467,362.05 judgment was an improper measure of damages for purposes of Norwin's suit against Foreman, we reject Foreman's argument that the District Court erred in entering the $467,342.05 judgment in GAIC's first-party action against Norwin.  We cannot fault the District Court for entering summary judgment against Norwin when Norwin raised no opposition to the motion and, indeed, expressly advised the District Court that it did not oppose entry of the $467,342.05 judgment.  Norwin picked its own poison in that regard.

that not only was unsupported by the    contract language but may also have been unsupported by the facts.

In particular, Foreman wanted to introduce evidence to prove that, in fact, Norwin suffered no damages at all and that Norwin received the benefit of its bargain at no more than the contract price. *See Ferrer v. Trustees of Univ. of Pennsylvania*, 825 A.2d 591, 609 (Pa. 2002) (explaining that damages for breach of contract are typically measured by the non-breaching party's expectation interest, the interest—that is—in having the benefit of its bargain by being put in as good a position as it would have been in had the contract not been breached). In rejecting Foreman's request to introduce the Settlement Agreement as evidence that Norwin would never have to pay a dime to GAIC, the District Court concluded that "it is not necessary for Norwin to actually pay the judgment to suffer 'actual damages' or to maintain its damages claim against Foreman." The District Court based its conclusion on two Pennsylvania cases, *Ammon v. McCloskey*, 655 A.2d 549 (Pa. Super. Ct. 1995), and *Gray v. Nationwide Mutual Insurance Co.*, 223 A.2d 8 (1966), both of which involved assignees who stepped into the shoes of assignors to bring suit against third parties who caused damage—in tort—to the assignors in amounts determined by juries in contested proceedings. No such circumstances exist in this case.[20]

In *Gray*, the plaintiff brought suit against an insured for

---

[20] We note that, among other differences, there was no assignment of Norwin's breach-of-contract claim to GAIC. As stated by the District Court in its order on motions in limine: "There is no assignment provision in the settlement agreement and there is no evidence of record that any such assignment [from Norwin to GAIC] took place."

50

personal injuries resulting from an automobile accident. The insurance company undertook the defense and a jury verdict in excess of the policy limits was returned in the plaintiff's favor. After the insurance company paid the policy limits, the plaintiff demanded the unpaid balance of the judgment from the insured. The insured then assigned to the plaintiff his right to assert a bad faith claim against the insurer. The assignment agreement provided that, regardless of the outcome of a bad faith action, any obligation of the insured to the plaintiff would be satisfied. The plaintiff, as assignee, then brought suit against the insurer. After the trial court dismissed the assignee's bad faith claim against the insurer, the plaintiff appealed.

When the *Gray* case reached the Supreme Court of Pennsylvania, the first issue addressed was whether the insured was required to pay the balance due on the judgment as a prerequisite to a bad faith action against the insurer. In deciding that no such actual payment was required, the supreme court explained that, among other things, adoption of a non-payment rule would

> prevent[] an insurer from benefiting from the impecuniousness of an insured who has a meritorious claim but cannot first pay the judgment imposed upon him. . . . Were payment the rule, an insurer with an insolvent insured could unreasonably refuse to settle, for, at worst, it would only be liable for the amount specified by the policy. To permit this would be to impair the usefulness of insurance for the poor man.

*Id.* at 10 (internal quotation marks and citation omitted). The supreme court also noted that "such [non-payment] view recognizes that the fact of entry of the judgment itself against the insured constitutes a real damage to him because of the

51

potential harm to his credit rating." *Id.*

In *Ammon*, a passenger who was injured in an automobile accident sued the driver of the vehicle. The driver's lawyer failed to raise a meritorious defense at trial, and a substantial judgment—on a jury verdict—was entered against the driver in favor of the passenger. The driver fired his lawyer, then retained new counsel who negotiated a settlement between the driver and the passenger. In exchange for the passenger's promise not to execute the judgment against the driver, the driver assigned to the passenger the driver's claim for legal malpractice against the driver's former lawyer. Relying on *Gray*, the *Ammon* court held that actual payment of the judgment by the driver was not a prerequisite to the assignee's legal malpractice claim against the lawyer. The court explained: "The lawyer occupies no less a fiduciary relationship to the client than an insurer occupies with respect to its insured, and the judgment entered against a client constitutes no less a real damage than the entry of a judgment against an insured." *Id.* at

553.

We are unpersuaded that the non-payment view adopted in *Gray* (and followed in *Ammon*) applies in this case. In *Gray*, the defendant in the original action (the insured) suffered a litigated judgment, the amount of which resulted, in part, from the alleged tortious conduct of the defendant in the second action (the insurance company that defended the original action). The insured satisfied the judgment by assigning to the plaintiff the insured's right of action against the insurance company. Fashioning a rule to fit the circumstances, the Supreme Court of Pennsylvania would not permit the insurance company to raise as a defense in the second action the insured's non-payment of the judgment because, to do so, would reward the insurance company whose tortious conduct contributed to

52

the harm suffered by the insured. The circumstances in *Ammon* were similar. In contrast, the original defendant in this case—Norwin—agreed to entry of an uncontested judgment, all the while knowing that it would never have to pay the judgment from its own pockets. The defendant in the second action—Foreman—did not participate in or have any knowledge of the agreement that resulted in the uncontested judgment. The *Gray* rule simply does not fit the circumstances here, and the District Court's reliance on those cases was misplaced.

In its breach of contract action against Foreman, Norwin was required to prove that it did <u>not</u> get the benefit of its bargain. Foreman was entitled to defend by showing otherwise. That Norwin had no obligation to pay GAIC any monies for the two school projects was relevant to the issue of Norwin's damages, and Foreman should have been permitted to introduce evidence to that effect. The District Court abused its discretion by ruling to the contrary.

In its motion for summary judgment, Norwin argued to the District Court that the "[d]amage incurred by the School District is the amount that it is required to pay twice resulting from Foreman's failure to obtain consents of surety."[21] In fact, the record is devoid of evidence that Norwin has been, or ever

---

[21] Norwin's "pay-twice" argument was first advanced to the District Court *before* the Settlement Agreement was executed. The District Court entered summary judgment months *after* the Settlement Agreement was executed, without being informed that, pursuant to the terms of the Settlement Agreement, Norwin would never have to pay any monies twice. At oral argument, this panel pointed out that, by failing to inform the District Court about the changed circumstances, Norwin caused the District Court to enter summary judgment based, in part, on misrepresentations.

will be, under an obligation to pay any amounts twice for its school projects. At oral argument before this panel, Norwin's counsel was asked to explain what damages Norwin suffered. Counsel did not reiterate the "pay twice" argument. She, instead, responded by saying that there was a judgment against Norwin that could affect the school's credit rating.[22] She gave no other explanation for Norwin's damages.

When a District Court has abused its discretion in admitting, or not admitting, evidence, and has affected a party's substantial rights in doing so, we ordinarily remand the case to the District Court for further proceedings. Here, we see no need for remand. To succeed on its breach-of-contract claim against Foreman, Norwin was required to prove that it was damaged, that it did not receive the benefit of its bargain. We have said that Norwin cannot rely on GAIC's uncontested judgment to prove that it was damaged by Foreman. For the same reasons, the effect—if any—of that judgment on Norwin's credit rating also cannot be attributed to Foreman. In addition, the record establishes that Norwin has not paid, and will not be required to pay, anything to GAIC. The record is otherwise devoid of evidence that Norwin did not get exactly what it bargained for—two completed school projects at the contract price.[23]

---

[22] Norwin's counsel did not mention that the judgment against Norwin will be satisfied—without Norwin's having to pay one dime—once Norwin's action against Foreman is resolved. The effect, if any, on the school's credit rating will be brief.

[23] We note, moreover, that even though Norwin failed to complain about defective and non-conforming work within the one-year post-completion maintenance bond period, Shoff nevertheless made the needed repairs—at no cost to Norwin—as the Settlement Agreement required.

Because the record establishes that Norwin suffered no damages as a result of Foreman's breach, we think a remand would be fruitless.

## IV. CONCLUSION

The facts in this case are singular, the case history bizarre. Briefly, Foreman breached its contract with Norwin by certifying final payment on two construction projects without obtaining the consent of surety. Such breach left Norwin exposed to potential damages. The issue of Norwin's damages was tried before a jury, but the District Court's evidentiary rulings precluded a fair trial for Foreman. Consequently, the results of that trial—both the District Court's judgment on damages as well as the jury's verdict upon which the damages judgment was based—cannot stand. The record, moreover, contains no evidence to establish that Norwin was, in fact, damaged by Foreman's breach. Accordingly, we will vacate the jury's verdict and the District Court's judgment and will remand to the District Court with directions to enter judgment in Foreman's favor.

NYGAARD, Circuit Judge, dissenting

Because the majority's conclusion collides with the plain language of the contract, I must dissent. I shall be brief:

In ruling that Norwin did not have any actual damages, the majority relies heavily upon a settlement agreement between Norwin and Great American that was properly excluded in an evidentiary ruling by the District Court because it was not relevant to the matter between Norwin and Foreman. Moreover, Great American's conditional forbearance of its judgment

55

against Norwin did not negate Norwin's obligation to satisfy the judgment. The result reached by the majority now allows Foreman to escape the consequences of its breach, leaving either Norwin or Great American to suffer the damages.

Moreover, the majority posits that, even if damages had been awarded, the amount of damages could not exceed the "final payment" made by Norwin to the contractor. I think the majority misinterprets the language of the contract. The contract required Foreman to obtain the consent of Great American before releasing the final payment and retainage. The majority misinterprets the contract to conclude that Great American's authority was limited to signing off only on the final payment. In so doing, the majority misapprehends an important factual basis for the damages.

Because, in my view, the majority has erred and the District Court was correct, I must respectfully dissent.